# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

AARON L. JACOBS, JR.,

        Plaintiff,

        -vs-                       Case No.   09-C-0406

CPL. GREGG OWEN, CORPORAL LEYENDECKER,
C.O. BRIAN NIES, CORPORAL MISTY ANDERSON,
C.O. JENIFFER JEAN PAGEL, C.O. LAWRENCE A. OLSEN,
C.O. NICHOLAS J. DEQUAINE, and LT. JOHN WILLIAM MITCHELL,

        Defendants.

# DECISION AND ORDER

The plaintiff, Aaron Jacobs, is a Wisconsin state prisoner who is proceeding *pro se* on claims he brought under 42 U.S.C. § 1983. After screening the plaintiff's amended complaint, the Court allowed the plaintiff to proceed on an excessive force claim against defendants Owen, Nies, Leyendecker, Anderson, Pagel, Olsen, and Dequaine, as well as a failure to protect claim against the same defendants. He also was allowed to proceed on a due process claim against defendants Owen and Mitchell. This matter is now before the Court on the defendants' amended motion for summary judgment.

As an initial matter, the Court notes that the defendants challenge the timeliness of the plaintiff's materials in opposition to their motion for summary judgment. The Court directed the plaintiff to file his response on or before Friday, December 16, 2011. Although

the materials were not received by the Court until December 19, 2011, the plaintiff filed a

certificate of service indicating that he submitted the documents to the business office for

mailing on December 14, 2011.  Applying the "mailbox rule," *see Edwards v. United States*,

266 F.3d 756, 758 (7th Cir. 2001), papers filed by a prisoner are deemed filed on the date

they are given to prison authorities for mailing.  Thus, the plaintiff's response was timely and

will be considered.

## I.  SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A.,*

*Inc.*, 629 F.3d 665, 668 (7th Cir. 2011).  "Material facts" are those under the applicable

substantive law that "might affect the outcome of the suit."  *See Anderson*, 477 U.S. at 248.

A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support

the assertion by: "(A) citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials; or (B) showing that the materials cited do not

establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## II.  FACTS[1]

On May 30, 2007, the plaintiff, Aaron Jacobs, was being held in cell F104 at the Brown County Jail (the "Jail").  He was awaiting a transfer to the Dodge Correctional Institution because his extended supervision was in the process of being revoked.  At that time, the plaintiff was seventeen years old.  The defendants are all employees of the Jail, with various ranks and titles.

Jacobs was on punitive segregation, loss of recreation, 24 hour lock down, and administrative confinement. As a result, he was allowed to possess in his cell only one mattress, one smock gown, and one smock blanket.  While sitting in his cell on May 30, 2007, during first shift, Jacobs became bored.  After using and flushing the toilet, Jacobs heard a "clink" sound from inside the toilet and noticed that the toilet paper holder fell off inside the sink.  He then stuck his hand through the hole and unscrewed a "J" shaped lead pipe that was about ten inches long.  He did not unscrew anything else or break anything else

---

[1]  The Facts are taken from the parties proposed findings of fact and affidavits. Where there are disputes, the Court has presented the plaintiff's version of the facts.  *See Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009). The defendants challenge some portions of the plaintiff's affidavit because they believe they are not based on the plaintiff's personal knowledge.  However, the challenged information is taken from the documents attached to the plaintiff's affidavit.  The Court will consider the entirety of the plaintiff's affidavit and its exhibits.

inside or outside the toilet or anywhere else in the cell.

At around 1:30 p.m., defendant Nicholas DeQuaine came to conduct a security check. When DeQuaine approached cell F104, Jacobs showed him the lead pipe and gave it to him through the food trap. Jacobs also explained how he had come to possess the pipe. He knew that he was not permitted to damage the sink in the cell, and he knew he could not be in possession of the pipe or any other foreign objects while in the Jail. Once Jacobs surrendered the pipe to the guard, he knew that he would need to be moved to a different cell so that maintenance could repair the sink in F104.

About five minutes later, defendant Misty Anderson entered the day room. She came right to Jacobs' cell and informed him that she was authorizing his movement to the "restraint chair." (Affidavit of Aaron L. Jacobs, Jr. [Jacobs Aff.], ¶ 15). The restraint chair is a mechanical chair made of metal, thick plastic, and nylon that secures a person's arms, shoulders, waist, and ankles. It is utilized to control the behavior of a violent inmate or as a preventative measure for suicidal inmates. Jacobs reasoned with Anderson that he had not been resistive, that he had been cooperative, and that there was no need to strap him in the restraint chair. Anderson said that she did not want to house Jacobs in any of the bigger day rooms and refused to move him to any of the medical cells because there are showers inside those cells that she did not want Jacobs to use. Anderson said that she would try to find an alternative and left.

Awhile later, Anderson returned and informed Jacobs that she had cleared cell

4

F105 and would transfer him there. She mentioned that the floor drain in that cell needed to be fixed, but said there was already a maintenance order in for that to be done. She then left to retrieve the security team. Cells F105 and F106 are rubber padded safety cells and are utilized for inmates who cause harm to or are a threat to their own safety. Those cells have no sink or toilet or raised structures. There is just a metal plated, circle shaped drain in the middle of the cell floor that is used to dispose of human waste and can only be flushed from the pod offices outside the cell.

At approximately 2:35 p.m., defendants Misty Anderson, Jennifer Pagel, Lawrence Olsen, and Brian Nies returned to transfer Jacobs. They had with them a "bullstrap" and velcro belted handcuffs ("ripp count"). (Jacobs Aff., ¶ 24). The four officers came directly to Jacobs' cell and opened the food trap. Jacobs stuck his hands out of the food trap and was secured to the cell door with the "bullstrap." Nies handcuffed Jacobs inside the cell, and then the handcuffs were connected to a belt around Jacobs' waist. Nies then waived his arm while holding the "ripp count" out of the food trap, and DeQuaine buzzed open the cell door. Jacobs stepped out as defendant Olsen swung the door open. While Jacobs faced the door, Nies patted him down and cleared him to be escorted.

Anderson, Pagel, Olsen, and Nies began escorting Jacobs out of the day room. Nies stated, "we should take his smock away," but no one answered. (Id. at ¶ 29). Jacobs saw DeQuaine by the computer at the officers' station. Jacobs does not claim that any force was used against him by any of the officers as he was removed from cell F104 or while he

was being escorted to cell F105. Plaintiff was fully cooperative while being transferred to cell F105.

As the group entered the next day room, the door to cell F105 was wide open and directly ahead of Jacobs. He saw and smelled urine and feces overflowing in the drain in the floor and noticed hair balls, bread, and cookie crumbs strewn all over the cell floor. As Pagel strapped Jacobs' right wrist to the door, Jacobs verbally objected and informed Anderson and the other officers that they could not put him in cell F105 because it was out of order and unsanitary. Anderson informed Jacobs that she knew about the cell conditions and that there already was an order in for maintenance. But she said that there was nowhere else to put Jacobs other than medical cells. Jacobs explained that it would be unconstitutional to put him in a room with such conditions. Anderson informed Jacobs that if he did not go in, he would be forced into cell F105 and receive another conduct report. Jacobs complied, and Nies unstrapped the "ripp count."

Nies then demanded that Jacobs take off his smock gown, even though it was the only article of clothing he was wearing and he would be naked without it. Jacobs vigorously shook out the smock in front of the four officers and said, "see look I don't have anything hidden underneath." (Jacobs Aff., ¶ 40). Nies got agitated and slammed Jacobs' body against the cell door. Pagel grabbed Jacobs' head and slammed his face into the door. Nies, Pagel, Anderson, and Olsen, along with DeQuaine, pinned Jacobs' head and body against the cell door. Jacobs was not resisting, but Nies yelled that he would knee Jacobs if

6

he tried to move. Nies cocked his knee back in a threatening manner, and Jacobs did not move.

Anderson and DeQuaine yanked the smock off Jacobs, causing the velcro to scrape his shoulder. Then all five officers threw Jacobs into the wall by the cell door as the slammed the door. But Jacobs got stuck and was pinned in between the door and the door frame. It hurt, and Jacobs yelled for them to stop pushing on the door. The officers were yelling at the same time. Realizing Jacobs was stuck, they eased up their pressure just enough for him to slip into the cell. He was then locked in cell F105.

Even when no other inmates are around and the inmate is not attempting to hurt himself or others, the removal of handcuffs from an inmate once the inmate is secure inside of a cell is important to ensure the safety of the inmate himself, fellow inmates and correctional officers. Specifically, if handcuffs are not immediately removed from an inmate, there is potential for the inmate to get one or both hands out of the handcuffs and to use the handcuffs as a weapon.

Immediately after the door was shut, Nies grabbed the waist belt ("ripp count") and "bull strap" that were cuffed to Jacobs' wrists and yanked and pulled, causing Jacobs' arms to get stuck in a vertical position at the inner opening of the food trap in the door. Jacobs yelled for the defendant to stop pulling. He also tried to pull back and position his arms at an angle to fit through the food trap opening. Then Jacobs heard running footsteps and felt an even harder jerk that pulled his arms out of the trap or slot. Owen slammed the

7

food trap shut on Jacobs' arms. Owen and Leyendecker applied pressure to the food trap door with their body weight while Jacobs' arms were still stuck.

Anderson removed the waist belt and handcuffs. Owen ordered Anderson to get the stun shield, and Anderson left. Jacobs did not immediately remove his arms from the food-trap door after the handcuffs were removed because defendants Owen, Leyendecker and Nies were pinning plaintiff's arm in the food trap by way of body weight. Officer Leyendecker gave Jacobs a command to pull his arms into the cell, and Officer Owen gave Jacobs a command to stop resisting. Jacobs could not comply with Leyendecker's command because his arms were being pinched in the food trap; he was not resisting. Jacobs did not try to grab any officers. Despite the officers' commands, Jacobs could not pull his hands in due to the defendants using body weight to pinch Jacobs' arms in the food trap.

Owen then used knee strikes on the trap door; two knee strikes while Jacobs' left arm was still pinned inside the trap door. Four knee strikes while his right arm was pinned in the trapdoor. Leyendecker continued to hold pressure on the trap door while Owen stepped back and kicked Jacobs' right hand six or seven times. Jacobs was yelling and crying out in pain and telling defendants Nies, Owen, and Leyendecker to stop. Then Anderson came running up with the stun shield and put it in front of the trap door blocking Jacobs' hand and forearm from defendant Owen. She also said, "Owen stop." (Jacobs Aff., ¶ 60). The pressure eased off of the trap door, and Jacobs was able to withdraw his right forearm from the trap.

8

Jacobs saw multiple injuries to both his right and left hands. Jacobs could not move his right wrist, hand, or fingers, and his face was swollen. Jacobs also injured his left hip and shoulder. The pain was unbearable. Jacobs complained of pain in his arms and was sent for x-rays; they were negative for any broken bones.

After the incident, Jacobs was issued a conduct citation for disruptive conduct. At about 5:25 p.m. that day, Officer Owen came to Jacobs' cell and explained that he was issuing a sanction of 30 days in punitive segregation and 30 days loss of recreation. Jacobs requested a full due process hearing and asked for another inmate to attend the hearing, as well as all the staff involved. Jacobs also asked for a staff advocate and refused to waive the 24 hour time limit or any of his rights. Owen held the hearing right at Jacobs' cell door and upheld the sanctions.

Owen advised Jacobs that he had the right to appeal to a lieutenant, and Jacobs told Owen that he wished to appeal. Jacobs asked an unknown officer to help him file a grievance, and he did so. At about 7:20 p.m., defendant Lieutenant John Mitchell came to Jacobs' cell to conduct an appeal. During the appeal, Jacobs was given the opportunity to tell Lieutenant Mitchell his side of the story and describe what had taken place on May 30, 2007. Jacobs denied all allegations that he had been disruptive. He also requested that Mitchell speak to Jacobs' inmate witness and staff witnesses who were involved in the incident. Jacobs also told Mitchell he needed a staff advocate and time to prepare a defense. Additionally, Jacobs requested a full due process hearing and indicated that it was improper

9

for Owen to conduct the hearing since he was involved in the incident.  Mitchell denied all of Jacobs' requests and upheld the sanctions.  Jacobs told Mitchell that his rights were being violated.  Mitchell said, "I'm not finding you not guilty, why do you care[?] You're going to prison in the morning anyway," and he left.  (Jacobs Aff., ¶ 73).  Jacobs was transferred out of the Brown County Jail the next day, May 31, 2007.

If an inmate is released prior to the completion of his punitive sentence and is then reincarcerated, he serves the remainder of the original punitive term upon his return. Jacobs has been booked in the Brown County Jail approximately thirty times since May 30, 2007.  Accordingly, he has completed and served the entire sanction issued by defendant Owen and upheld by defendant Mitchell.

This matter was referred to the Brown County Sheriff's Department for Professional Standards Division investigation.  Reports were prepared by and/or interviews were conducted with each of the officers involved in the May 30, 2007 incident.  Discipline was recommended only for defendant Owen.  Ultimately, a *Loudermill* hearing was held for Owen on November 6, 2007, and a Brown County Disciplinary Report resulted.  Owen received the following discipline: (1) a reduction in rank from Corporal to Corrections Officer; (2) supervisory referral to the Employee Assistance Program; (3) immediate removal from C.E.R.T. for a period of one year; and (4) a five day (forty hours) suspension.

## III. DISCUSSION

The defendants argue that they are entitled to summary judgment on all of the plaintiff's claims. They contend that the plaintiff's Eighth and Fourteenth Amendment rights were not violated as a matter of law. They also submit that they are entitled to qualified immunity. The plaintiff opposes the motion, and his specific arguments will be addressed below.

## A. Excessive Force

The plaintiff was allowed to proceed on excessive force claims against defendants Owen, Leyendecker, Nies, Anderson, Pagel, Olsen, and DeQuaine. The plaintiff avers that, as of May 30, 2007, his extended supervision had been revoked and he was awaiting transfer to Dodge Correctional Institution (DCI). In fact, the plaintiff was transferred to DCI the day after this incident. Accordingly, the Court will analyze the plaintiff's excessive force claims under the Eighth Amendment. *See Forrest v. Prine*, 620 F.3d 739, 744 (7th Cir. 2010) (quoting *Lewis v. Downey*, 581 F.3d 467, 473 (7th Cir. 2009)).

A violation of the Eighth Amendment's Cruel and Unusual Punishments Clause consists of two elements: (1) objectively, whether the injury is sufficiently serious to deprive the prisoner of the minimal civilized measure of life's necessities, and (2) subjectively, whether the prison official's actual state of mind was one of "deliberate indifference" to the deprivation. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294 (1991). A custody officer's use of physical force against an inmate may

11

give rise to an Eighth Amendment claim. *Hudson v. McMillian*, 503 U.S. 1, 4 (1992). The

inquiry for a claim of excessive force is "whether force was applied in a good-faith effort to

maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503

U.S. at 7; *see Fillmore v. Page*, 358 F.3d 496, 503 (7th Cir. 2004). Several factors contribute

to this determination, including "the need for the application of the force, the amount of force

applied, the threat an officer reasonably perceived, the effort made to temper the severity of

the force used, and the extent of the injury that the force caused to an inmate." *Fillmore*, 358

F.3d at 504. To successfully oppose a motion for summary judgment, the inmate must have

evidence that "will support a reliable inference of wantonness in the infliction of pain."

*Whitley v. Albers*, 475 U.S. 312, 322 (1986); *see also Fillmore*, 358 F.3d at 504. "Infliction

of pain that is 'totally without penological justification' is *per se* malicious." *Fillmore*, 358

F.3d at 504 (quoting *Hope v. Pelzer*, 536 U.S. 730, 737 (2002)).

The plaintiff's brief focuses on the actions of defendant Owen, which are the

most egregious. With regard to Owen, the plaintiff conducted a thorough analysis of the

factors listed above. Owen slammed the plaintiff's hands in the trap door after the hand cuffs

were removed, and then applied knee strikes to either the plaintiff's hands or the trap door.

First, the plaintiff questions the need for the application of force, since he was

already secured in cell F105 when the force occurred. Second, the plaintiff argues that even

if there was a need to use force, that Owen used more force than was necessary since he was

already confined to his cell and could not cause harm through the trap door. Third, the

plaintiff submits that his injuries were severe.  He had severe bruising and blood had been drawn, and his injuries were serious enough that he was taken for x-rays. Although the x-rays came back negative for broken bones, the plaintiff suffered nerve damage in his hands, for which he still receives treatment.  Fourth, the plaintiff surmises that Owen's only intent could have been to cause the plaintiff injury.  The plaintiff contends that Owen applied the knee strikes to either his hands or the trap door maliciously and sadistically and for the purpose of causing harm when the plaintiff was already confined to his cell and the handcuffs and ripp count had been removed.  Thus, the plaintiff concludes there was no need to use force to maintain or restore discipline.  According to the plaintiff, Owen knew his actions violated Jail policy and would cause injury to the plaintiff, but he did it anyway and did not stop when the stun shield arrived.  Once the stun shield arrived and the pressure lifted, the plaintiff immediately removed his hands from the trap door.  Owen was disciplined for his actions; following a hearing, he received a demotion, suspension and change in duty.

The evidence viewed in the light most favorable to the plaintiff "support[s] a reliable inference of wantonness in the infliction of pain." *Whitley*, 475 U.S. at 322; *see also Fillmore*, 358 F.3d at 504.  Accordingly, the defendants' motion for summary judgment regarding the plaintiff's excessive force claim against Owen will be denied.

The force employed by the other defendants does not rise to the same level. In fact, the situation presented by the plaintiff is not troubling to the Court until Owen arrived on the scene.  Prior to that, the defendants were using small amounts of force to maintain or

13

restore discipline as the plaintiff objected to his placement in cell F105 and the removal of his smock. Although the plaintiff avers that he did not resist, he does describe activity that would have been contrary to their attempts to place him in the cell. Even viewed in the light most favorably to the plaintiff, none of the actions of the other defendants could be considered to be "designed expressly for the purpose of punishing or humiliating" the plaintiff. *Fillmore*, 358 F.3d at 504.

## B. Failure to Act

The plaintiff also was allowed to proceed on failure to act claims against defendants Owen, Nies, Leyendecker, Anderson, Pagel, Olsen, and Dequaine for their failure to act to stop the others from assaulting the plaintiff. It is well established that "[a]n official satisfies that personal responsibility requirement of § 1983 if she acts or fails to act with a deliberate or reckless disregard of the plaintiff's constitutional rights." *Fillmore*, 358 F.3d at 506 (quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)).

The plaintiff argues that the original group of officers had the situation under control but backed away when Owen and Leyendecker arrived. They then stood by and watched Owen assault the plaintiff, said nothing, and did not make any attempt to stop him.

The defendants argue first that there was no excessive force and, therefore, there was no failure to act to stop a constitutional violation. However, in light of the Court's decision regarding Owen's conduct, this argument does not entitle them to summary judgment.

14

The defendants also contend that none of the defendants ordered or condoned Owen's actions and that the events evolved rapidly so there was no realistic opportunity to intervene. These arguments are persuasive to the Court. The defendants' statements indicate that Owen arrived and quickly took over. Anderson left to retrieve the stun shied and, by the time she returned, she told Owen to stop and the incident was over. Given the plaintiff's narrative regarding the events, no reasonable jury could conclude that any of the other defendants had an opportunity to stop him from slamming the trap door or delivering the knee strikes to the plaintiff's hands or the trap door. Additionally, Owen's failure to stop himself is part of the excessive force claim and not a separate failure to act claim. Thus, all of the defendants are entitled to summary judgment on this claim.

**C. Due Process**

Finally, the plaintiff was allowed to proceed on Fourteenth Amendment due process claims against defendants Owen and Mitchell regarding the way in which his conduct report was handled. He asserts that he was given improper notice of due process and did not sign a notice of hearing rights form. He also contends that his rights were violated because he: (1) was not allowed to call witnesses, including another inmate who saw the whole incident; (2) was not told why he was found guilty or what evidence was relied upon; (3) was not provided with a staff advocate; (4) had defendant Owen conduct the first hearing and issue the sanction, even though Owen was involved in the incident.

For a convicted prisoner to establish a procedural due process violation under

15

the Fourteenth Amendment, the prisoner must demonstrate that the state deprived him of a liberty or property interest created either by state law or the Due Process Clause itself. *See Sandin v. Connor*, 515 U.S. 472, 483-84 (1995). A liberty interest exists when prison officials restrain the freedom of inmates in a manner that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.

The defendants argue that the plaintiff had no liberty interest that was affected by the disciplinary process on May 30, 2007. The plaintiff was already in punitive segregation status, with loss of recreation, 24 hour lock down, and administrative confinement. As a result, additional days of the same restrictions did not "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *id.*, and does not implicate a liberty interest. Consequently, the defendants are entitled to summary judgment on the plaintiff's due process claim.

The plaintiff anticipated correctly that the defendants would argue that they were not bound by the regulations of the Wisconsin Department of Corrections regarding due process hearings. Nevertheless, the plaintiff is wrong in his insistence that the regulations apply. While housed at the Brown County Jail, it is the Jail's regulations that apply. Even if the defendants failed to follow the applicable regulations regarding hearings on conduct reports, there is no evidence that those regulations created a liberty interest or that failure to follow the regulations would constitute a *per se* violation of due process.

## IV. ORDER

**IT IS THEREFORE ORDERED** that the defendant's amended motion for summary judgment is **granted in part and denied in part**. (Docket #131).

**IT IS FURTHER ORDERED** that the following defendants are **dismissed** as defendants in this case and judgment will be entered in their favor when the entire case is closed: Ralph Leyendecker, Brian Nies, Misty Anderson, Jennifer J. Pagel, Lawrence A. Olsen, Nicholas J. DeQuaine, and John William Mitchell.

Dated at Milwaukee, Wisconsin, this 2nd day of March, 2012.

**BY THE COURT**:

_____

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**